IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

ASSOCIATION CASUALTY INSURANCE COMPANY;
BENCHMARK INSURANCE COMPANY; GEORGIA
CASUALTY & SURETY COMPANY; and NATIONAL
SECURITY FIRE and CASUALTY COMPANY                                PLAINTIFFS

VERSUS                                                     CIVIL ACTION NO. 2:09cv24KS-JCS

ALLSTATE INSURANCE COMPANY; FARM BUREAU
MUTUAL INSURANCE COMPANY; NATIONWIDE MUTUAL
FIRE INSURANCE COMPANY d/b/a NATIONWIDE INSURANCE
COMPANIES; STATE FARM FIRE AND CASUALTY COMPANY;
AND ST. PAUL TRAVELERS COMPANIES                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the court on a Motion for Summary Judgment **[#299]** filed on behalf of the defendants Allstate Insurance Company, Nationwide Insurance Companies and State Farm Fire and Casualty Company(collectively, "Defendants") pursuant to Rule 56 of the Federal Rules of Civil Procedure. All of the remaining defendants have filed endorsements adopting this motion. The court, having reviewed the motion, the response, the briefs of counsel, the pleadings and exhibits on file, having conducted oral argument and received supplemental briefing and being otherwise fully advised in the premises finds that the motion is not well taken and should be denied. The court specifically finds as follows:

## **FACTUAL BACKGROUND**

The court has detailed the origin, purpose, composition, and operation of the MWUA in prior opinions which will not be restated in full herein. Instead, the court will restate only enough factual background to support the present ruling.

The MWUA is a not-for-profit entity that was established by the Legislature to "assure an adequate market for windstorm and hail insurance in the coast area of Mississippi"[1] and is composed of all insurers who write property insurance on a direct basis anywhere in Mississippi. 1987 MISS. LAWS, ch. 459, § 1; Miss. Code Ann. § 83-34-3 (Supp. 2006).[2] The MWUA operates pursuant to a Plan of Operation that was approved by the Commissioner of Insurance.

From 1987-2007, the MWUA was administered by an eight-member Board, comprised of three independent insurance agents plus an employee of five of the member companies, which at the relevant time were employees of Allstate, Mississippi Farm Bureau, Nationwide, State Farm and St. Paul Travelers, along with a non-voting member of the Commissioner's staff. Representatives of the Mississippi Department of Insurance attended Board meetings. The MWUA is operated and managed by specialized staff of the Mississippi State Rating Bureau, while the Board of the MWUA administers its business affairs and activities subject to the Commissioner's review.

The Commissioner is authorized to examine the affairs of the MWUA and require

---

[1] The statute defines the "Coast Area" as Hancock, Harrison, Jackson, Pearl River, Stone and George Counties. Miss. Code Ann. § 83-34-1.

[2] Chapter 34 of Title 83 of the Mississippi Code was revised in 2007 with an effective date of March 22, 2007. The statutory citations herein are to the versions effective at the time this lawsuit was filed in 2006 which had been unchanged since their initial passage in 1987.

it "at any time," to furnish him with additional information with respect to "any other matter which the [C]ommissioner deems to be material to assist him in evaluating the operation and experience of the association" and to file a statement summarizing the transactions, operations, and affairs of the MWUA with the Commissioner each year. Miss. Code Ann. §§ 83-34-25, 83-5-209(3) (Supp. 2006). The Commissioner can review any decision of the MWUA through a formal administrative Process. Miss. Code Ann. § 83-34-19 (Supp. 2006).

The Legislature established the MWUA to operate as a market of last resort for the issuance of insurance policies that private insurers choose not to underwrite, but not to compete with the private market. To maximize the writing of wind insurance by private insurance companies in the Coast Area, the Legislature created a voluntary writings credit mechanism. This voluntary writings credit mechanism promotes the legislatively preferred private market by creating an incentive for MWUA members to write insurance that provides coverage for the perils of windstorm and hail in the Coast area. In exchange for issuing these policies, private insurers reduce their potential exposure to MWUA losses. Thus, all insurers have the ability to avail themselves of the voluntary writings credit to reduce their exposure to MWUA losses

. Private insurance voluntarily underwritten in the Coast Area reduces the risk of loss to the MWUA, because a policy containing protection against windstorm and hail written in the private market will not be written in the MWUA. Conversely, if insurance is not voluntarily underwritten by a private insurer, the risk of loss to the MWUA increases because the MWUA itself will be the issuer of last resort. Accordingly, the Legislature's goal of promoting a private market for insurance in the Coast Area, and having the

MWUA serve as a market of last resort, is advanced when insurers avail themselves of the voluntary writings mechanism.

Reinsurance reduces the risk of loss to an insurance company by spreading that risk from the insurance company to the reinsurance company. The more reinsurance that is purchased, the less the risk of loss to the insurer. Accordingly, the more reinsurance that the MWUA purchases, the less the risk of loss to the MWUA and its member companies. If the risk of loss to individual insurance companies is reduced through reinsurance, there is less incentive for those insurers to avail themselves of the voluntary writings credit mechanism which is designed to mitigate that same risk of loss. Accordingly, the defendants have taken the position that the Board must balance the effect of purchasing more reinsurance against the Legislature's preference to maximize a private market for insurance in the Coast Area and have the MWUA operate as a market of last resort. As this court has previously recognized, the MWUA's governing statutes and Plan authorize but do not impose a duty on the Board to purchase any amount of reinsurance at all. Miss. Code Ann. § 83-34-5 (Supp. 2006).

Prior to the 2004 hurricane season, the Board contracted with Cooney, Rickard & Curtin, Inc. ("CRC"), a reinsurance broker, to collect and evaluate relevant underwriting and financial information in advance of each reinsurance purchase. CRC also periodically had the MWUA data evaluated under various catastrophe exposure models and conveyed all of this analytical work to the Board and discussed recommended reinsurance programs with the Board and the Board's Reinsurance Committee.

The Board evaluated different options to pay for reinsurance purchases. One option was to pay for reinsurance out of funds available in the MWUA's budget.

Another was to assess member companies to pay reinsurance premiums. When these options were considered from year to year, the Board decided to pay reinsurance premiums out of funds available in the MWUA budget and not to assess member companies for the premiums. The Board's stated concern for not assessing members for the cost was that to do so could have the effect of driving insurers from the Mississippi market.

Prior to purchasing reinsurance for the 2004 and 2005 storm seasons, the Board undertook a review of its reinsurance program by seeking quotes and proposals from its existing broker, CRC, and three other brokers in order to select a broker to represent the MWUA for the 2004-2005 reinsurance contract. After a detailed presentation by all three brokers, the Board chose CRC for its reinsurance quotes.

In connection with its analysis of reinsurance options for the 2004 and 2005 storm seasons, the Board requested additional information from CRC relating to various reinsurance purchase considerations including an indication of renewal rates and structure layering, additional catastrophe modeling, the possibility of standardizing reinsurance forms, moving the renewal date from July to March, securing flat premium or unadjusted annual premium, and optional restructuring of layers.

Based on CRC's analysis and its recommendations, the Board unanimously decided to purchase reinsurance to cover 100% of the first $100 million of MWUA losses, and any amount above this as funds were available. CRC representatives also advised the Board to consider obtaining a twenty-month contract, which would move the renewal date to a more favorable date in March. The Board agreed to this recommendation as well. In addition, the Board purchased a reinsurance contract that

had no reinstatement premium, which meant that if there was more than one named storm during the term of the reinsurance contract, the reinsurance limit would refresh itself after each storm without the payment of additional premium.

CRC representatives further advised the Board that an additional layer of $75 million in excess of $100 million could be purchased for $750,000. After consideration of CRC's analysis and advice, and after consultation with the MWUA full time staff, the Board unanimously decided to purchase the additional $75 million in excess of $100 million. Taken together, the 20 month reinsurance program purchased for the 2004 and 2005 storm seasons contained no self-insured layers, such that the gross amount of reinsurance in this program reached $175 million.

The $75 million in reinsurance excess of $100 million expired after the 2004 storm season and CRC recommended that the Board act immediately upon expiration to extend the $75 million layer through the 2005 storm season because the 2004 storm season had been severe, with four named storms, and CRC had concerns about imminent capacity issues and premium increases.

At the October 15, 2004, Meeting, the Board accepted CRC's recommendation and unanimously voted to immediately extend the $75 million. CRC went to the reinsurers to secure the $75 million for the 2005 storm season, and the reinsurers sold this coverage without requesting any new MWUA underwriting data or catastrophe modeling. The $175 million of reinsurance in place for the 2005 storm season reinsured to between a one-in-100-year and one-in-250-year event, according to the defendants. All of these reinsurance decisions were reported in writing to all members of the association.

As everyone is well aware, Hurricane Katrina hit on August 29, 2005, causing unprecedented devastation. As a result, the MWUA suffered an approximately $700 million shortfall resulting in an approximately $525 million assessment against windpool members. The plaintiffs instituted this action alleging that certain of the alleged members of the Board of the MWUA breached their fiduciary duty or were negligent in failing to procure "reasonable and appropriate" reinsurance on behalf of the MWUA for the 2004 and 2005 hurricane seasons. The defendants deny that they owed any fiduciary duties to the plaintiffs, individually, and assert that regardless, the decisions made by the alleged Board members relating to the 2004-2005 reinsurance purchase met any applicable standard of care and are protected from liability by the business judgment rule.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a

genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992).

In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984). The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record

which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John*, 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P. *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'" *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

## ANALYSIS

**Duty of Care**

The court will hereinafter address the problems with deciding which law to apply in this case but all parties seem to agree that the duty of care required of officers and directors is well stated in the context of corporate law. In that regard, the Mississippi Supreme Court has held;

> A director or officer has a duty to the corporation to perform the director's or officer's functions in good faith, in a manner that he or she reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances....
>
> (1) The duty in Subsection (a) includes the obligation to make, or cause to be made, an inquiry when, but only when, the circumstances would alert a reasonable director or officer to the need therefor. The extent of such inquiry shall be such as the director or officer reasonably believes to be necessary.

*Omnibank of Mantee v. United S. Bank*, 607 So. 2d 76, 85 (Miss. 1992)(citing *Principles of Corporate Governance*, § 4.01(a); and *Derouen v. Murray*, 604 So.2d 1086, 1092 (Miss.1992)). The court has also held

> [D]irectors and officers of a corporation stand in a fiduciary relationship to the corporation and its stockholders. These duties include exercising the utmost good faith and loyalty in discharge of the corporate office.

*Fought v. Morris,* 543 So.2d 167 (Miss.1989)(citing *Gibson v. Manuel*, 534 So.2d 199 (Miss.1988); *Ellzey v. Fyr-Pruf, Inc.*, et al., 376 So.2d 1328, 1332 (Miss.1979); *American Empire Life Ins. Co. v. McAdory*, 319 So.2d 237 (Miss.1975); *Cooper v. Mississippi Land Co.*, 220 So.2d 302 (Miss.1969); and *Knox Glass Bottle Co. v. Underwood*, 228 Miss. 699, 89 So.2d 799 (1956)).

**The Business Judgment Rule**

The defendants contend that while principles of corporate law should not be indiscriminately applied to an unincorporated association, the Board's reinsurance purchasing decision should, nevertheless, be protected by the business judgment rule. Under the business judgment rule, the Board is presumed to have made its reinsurance purchase decisions in good faith, and in the honest belief that the action taken was in the best interests of the company. See *City of Picayune v. S. Reg'l Corp.*, 916 So. 2d 510, 523 (Miss. 2005)("As a general rule, the courts refrain from interfering with internal management of a corporation and do not interfere in the affairs of a private corporation in the absence of proof of bad faith or fraud on the part of those entrusted with its management.");and *Omnibank,* 607 So. 2d at 85. To rebut this presumption, the defendants argue that the plaintiffs bear the burden of introducing evidence that the Board either lacked good faith or acted in self-interest. *See, e.g., Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)*(overruled in part on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del. 2000); *In re Compucom Sys., Inc. Stockholders Litig.*, 2005 Del. Ch. LEXIS 145, at *21 (Del. Ch. Sept. 29, 2005).

The plaintiffs contend that the court should deny the defendants' motion for summary judgment because the business judgment rule does not apply to their conduct. The plaintiffs continue by arguing that their claims implicate two duties—the duty of care and the duty of loyalty—that "differ in nature and content, though they doubtless intersect and overlap." *Omnibank*, 607 So. 2d at 84. They assert that the defendants' summary judgment motion based on the business judgment rule applies only to the duty of care. *See, e.g., In re e2 Communications, Inc.*, 320 B.R. 849, 860 (Bankr. N.D. Tex.

2004) ("The business judgment rule does not apply to a breach of the duty of loyalty.")(citing *Gearhart Industries, Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 724 n.9 (5th Cir. 1984) (Texas law)); *see also Omnibank*, 607 So. 2d at 85 (holding that .[a] director or officer who makes a business judgment in good faith fulfills the duty ... [of care] if the director or officer. meets the required elements)(bracketed language in original).

The plaintiffs also argue that the business judgment rule does not apply to this unincorporated non-profit association, but only in corporate contexts. Indeed, the court has struggled mightily with the correct law to apply in this hybrid situation. The MWUA is a statutorily created non-profit association. But it does not stop there. Its membership is coerced to participate by virtue of the fact that each chooses to do business in Mississippi. In most all corporate and association situations, membership or participation is entirely voluntary. One can choose to purchase stock in a corporation or choose to become a member of a non-profit organization. So the court has struggled with what law to apply to this hybrid of all situations. The parties have asserted principles of corporate law, non-profit incorporated associations, unincorporated non-profit associations and even partnership law. The MWUA has characteristics of all of these types of organizations with the twist of mandatory membership for all who wish to sell property insurance in Mississippi. Surely, a daunting task for the court to wade through, but one that it will undertake as best it can.

The court is convinced after a thorough review of this case that the business judgment rule does apply to the duties owed from the defendants to the plaintiffs. Each of the members of the MWUA have a profit maximization motive which is in direct competition with each other. Yet they have been involuntarily placed in the association

by legislative action if they wish to continue to do business and maximize profits from the citizens of Mississippi. The Board is then charged with managing and looking out after the interests of a highly diverse group of competitors and to do so in a way that is in the best interests of the MWUA and, perhaps, causes the least harm to the members. To deprive the Board of the defense of the business judgment rule is unwarranted and uncalled for in this court's estimation. That being said, the court concludes that there are myriad factual disputes regarding whether the decisions regarding reinsurance were indeed an exercise of good business judgment which prevent the granting of summary judgment on this issue.

**Fiduciary Duty/Standing**

The defendants argue that in addition to being protected by the business judgment rule, the Board did not owe the plaintiffs a fiduciary duty. They point out that under Mississippi law, the plaintiffs have the burden of proving by clear and convincing evidence that they were owed a fiduciary duty. *Smith v. Franklin Custodian Funds, Inc.*, 726 So. 2d 144, 150 (Miss. 1998). As noted, the plaintiffs did not bring this case as a derivative action which would rely on an alleged fiduciary duty owed by the Board to the MWUA as a whole. Instead, the plaintiffs allege the existence of a fiduciary duty between themselves individually and the defendant Board members. The defendants further assert that there is no basis to establish a fiduciary duty between a board and individual members of an unincorporated association in particular. The defendants then assert that the plaintiffs' fiduciary claim is further attenuated, and separately fails, because the defendant entities were not Board members at the time of the challenged

reinsurance transaction. The court has already ruled that this latter question is one of fact for resolution by the jury. The former question is more one of standing than duty in the traditional sense. Indeed, the *Fought* case establishes that there is a fiduciary duty between officers and directors and the shareholders of a corporation. The question is whether that duty runs only to the shareholders collectively or to each individually. To answer that question, the court must first determine if the plaintiffs have asserted claims of individualized injury such that a representative suit rather than a derivative one is the correct way to enforce any alleged breach.

Shareholders typically cannot sue corporate boards directly; therefore a derivative action is required. *See, e.g., Bruno v. Southeastern Servs., Inc.*, 385 So. 2d 620, 622 (Miss. 1980) ("the stockholder's rights are merely derivative and can be asserted only through the corporation," even when "the acts complained of resulted in damage both to the corporation and to the stockholder"); *Lewis v. Knutson*, 699 F.2d 230, 237-38 (5th Cir. 1983).

Courts have applied these universally accepted principles to non-corporate entities, including condominium, homeowner and cooperative associations which the defendants assert are analogous to the MWUA. *See, e.g., Cigal v. Leader Dev. Corp.*, 408 Mass. 212, 219, 557 N.E.2d 1119, 1123 (1990) (analogizing condominium association members to corporate shareholders and finding that derivative suit is proper manner to challenge actions of Board); *Gibbs v. Marcari*, 8 Mass. L. Rep. 170 (Mass. Super. 1997) (holding homeowner could assert claim against homeowners association board only through derivative suit); *Caprer v. Nussbaum*, 825 N.Y.S.2d 55, 65-68 (N.Y. App. 2006) (applying corporate law principles, derivative suit is proper vehicle for

condominium owners to assert claims regarding injuries to the common interest); *see also Myer v. Cuevas*, 119 S.W.3d 830, 836-837 (Tex. App. 2003) (holding condominium owner had no standing to bring claim against condominium association, a non-profit corporation, for increased assessments caused by boards' alleged mishandling of funds, because damage was to the association's assets).

A judicially recognized exception to the general rule prohibiting direct actions against boards is where a corporate shareholder can show that he or she suffered injuries that are separate and unique from the injury to the corporation itself. *Vickers v. First Mississippi Nat. Bank*, 458 So.2d 1055, 1063-64 (Miss. 1984). As with the universally accepted standing rules, this exception has been applied to condominium, homeowners and cooperative associations. To bring a direct action against a condominium or similar board, homeowners must prove a separate and unique injury.

The defendants argue that the facts of this case clearly establish that the plaintiffs lack standing to bring their individual claims against the MWUA Board because, by their own admission, the plaintiffs have not suffered unique damages, and any potential recovery they could obtain is derivative. The plaintiffs allege that Hurricane Katrina caused an approximately $700 million loss to the MWUA in the form of claims the MWUA paid to its policyholders. Approximately $525 million of this $700 million loss was not reinsured and was paid through assessments by MWUA member companies. Thus, according to the defendants, the plaintiffs do not allege injuries that are separate and unique from the alleged injury to the MWUA itself.

The plaintiffs argue that while the duty owed was generally shared by all members, the injury each suffered was not. They allege that the injuries were peculiarly

suffered by non-director members like the plaintiffs and other members who lacked voluntary writing credits sufficient to insulate them against any catastrophe assessment for 90% of the losses.

Another interesting question is whether the MWUA was actually injured as an entity. It exists as only a pass-through organization for potentially unlimited liability exposure to its members. As an entity, it could never ultimately suffer either a loss or a profit. Any profit is refunded to the members by statutory mandate and any liability is assessed to those same members. To conclude that the injury was only to the entity of the MWUA does not appear to be correct. Clearly, each of the members suffered injury directly and unique to it in an amount based on each's proportionate part of the assessment. This situation does not fit neatly within any of the accepted organizational guidelines established for corporate or other entity governance. The court is of the view that the only means to enforce the Board's duty owing to the members is by each member separately in this hybrid situation. Thus the plaintiffs have standing to pursue their remedies for the alleged breach of duty owed by the Board to the members.

The defendants assert that, generally, corporate boards do not owe fiduciary duties to individual shareholders. *See, e.g., Allyn v. Dually*, 725 So. 2d 94, 103 (Miss. 1998) ("Directors and officers of a corporation owe a fiduciary duty to their corporation. Any fiduciary duty owed to shareholders of a corporation is owed to the shareholders collectively and not individually.")(quoting *Pond v. Equitable Life & Cas. Ins*. Co., 872 P.2d 1070, 1072 (Utah. Ct. App. 1994)). However, there is a judicial exception finding a fiduciary duty running directly from a board of directors to individual members where fiduciary or other duties to those members are expressly established by statute or in the

bylaws of the business entity. The plaintiffs argue that this is the precise situation presented here.

The plaintiffs argue that the statutory scheme setting up the MWUA and the Plan of Operations under which it operates establishes that the Board is to make reinsurance decisions on behalf of and for the benefit of the members and that the members are entitled to rely on the Board to make such decisions. While this argument is somewhat thin to establish a fiduciary duty running from the Board to each member, the court concludes that there are factual disputes which prevent the entry of summary judgment on this issue. The court will review this question as well as the standing question as the evidence is presented at trial.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Summary Judgment **[#299]** filed on behalf of the defendants is denied.

SO ORDERED AND ADJUDGED this the 18th day of February, 2009.

> *s/Keith Starrett*
> UNITED STATES DISTRICT JUDGE