IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

ASSOCIATION CASUALTY INSURANCE COMPANY;
BENCHMARK INSURANCE COMPANY; GEORGIA
CASUALTY & SURETY COMPANY; and NATIONAL
SECURITY FIRE and CASUALTY COMPANY                    PLAINTIFFS

VERSUS                                            CIVIL ACTION NO. 2:09cv24KS-JCS

ALLSTATE INSURANCE COMPANY; FARM BUREAU
MUTUAL INSURANCE COMPANY; NATIONWIDE MUTUAL
FIRE INSURANCE COMPANY d/b/a NATIONWIDE INSURANCE
COMPANIES; STATE FARM FIRE AND CASUALTY COMPANY;
AND ST. PAUL TRAVELERS COMPANIES                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the court on a Motion to Exclude Expert Opinions of Jacobus J. Van De Graaf **[#303]** filed on behalf of the defendants Allstate Insurance Company, Nationwide Insurance Companies and State Farm Fire and Casualty Company(collectively, "Defendants"). All of the remaining defendants have filed endorsements adopting this motion. The court, having reviewed the motion, the response, the briefs of counsel, the pleadings and exhibits on file and being otherwise fully advised in the premises finds that the motion is not well taken and should be denied. The court specifically finds as follows:

## FACTUAL BACKGROUND

The court has detailed the origin, purpose, composition, and operation of the MWUA in prior opinions which will not be restated in full herein. Instead, the court will restate only enough factual background to support the present ruling.

The Mississippi Windstorm Underwriting Association is a mandatory unincorporated association formed by the Mississippi Legislature to provide windstorm insurance for the highest-risk properties in Mississippi and purchase reinsurance to protect the Association's members, who are responsible for its losses. The Association is a residual market organization whose structure causes the purchase of large amounts of reinsurance for the benefit of the members.

For almost two decades, the MWUA has made windstorm and hail insurance available to residents of the coastal counties of Mississippi who otherwise would not have been able to obtain such insurance in the voluntary insurance market. The legislation and the Plan define the "Coast Area" as the six southernmost counties of Hancock, Harrison, Jackson, Pearl River, Stone and George.

A Board of Directors both performs the general administrative duties of the Association and purchases reinsurance on its members' behalf by a majority vote of the Directors. Under the Plan of Operations that governs the Association's activities, the Board is required to act as each member's "agent . . . in ceding reinsurance on behalf of the Member as authorized by the Plan." (Plan of Operations, Art. XIII). The defendants were appointed Board Members by the Mississippi Insurance Commissioner and had representatives sitting on the Board during the reinsurance decisions at issue in this lawsuit.

When Hurricane Katrina hit on August 29, 2005, the MWUA had in place $175 million in reinsurance. Katrina, however, caused losses in excess of $700 million to the Association. The MWUA paid those Katrina claims, collected the full $175 million in reinsurance, and assessed the member insurance companies to pay the un-reinsured losses of approximately $525 million.

The plaintiffs, MWUA members who voluntarily wrote practically no windstorm and hail insurance in the Coast Area, were responsible for a portion of the MWUA's un-reinsured Katrina losses. They allege in this case that the Board of the MWUA purchased too little reinsurance and have sued to recover these un-reinsured losses.

The plaintiffs filed the present action in Southern District of Mississippi on September 15, 2006. In accord with the Scheduling Order, the plaintiffs designated Jacobus J. Van de Graaf as their reinsurance expert on May 19, 2008. Van de Graaf has more than forty years of experience as a reinsurance broker, reinsurance executive, and board member for reinsurance and insurance companies. He was Chief Executive Officer and Managing Director of Towers Perrin Reinsurance, which is now the fifth largest reinsurance broker in the world, with over $170 million in revenues. Prior to that, he served as President and on the Board of Directors of Herbert Clough (now General Re Intermediaries), a reinsurance broker wholly owned by General Re. He also served as General Re's Senior Vice President in charge of Treaty Marketing and as a member of General Re's Management Committee. Van de Graaf has stayed active in the reinsurance industry following his retirement in 1999, serving on the board of insurance and reinsurance companies and acting as a reinsurance consultant. He is a certified arbitrator in the AIDA Reinsurance and Insurance Arbitration Society. Van de

Graaf also served on the board of the Nuclear Energy Liability Insurance Association, a semi-involuntary pool whose board (including Van de Graaf) purchased significant amounts of reinsurance to address nuclear energy's catastrophic potential.

Van de Graaf provided an expert report containing responses to ten questions. His answers include an array of opinions that are unchallenged by the defendants in their motion. Van de Graaf was deposed by the defendants in this matter on August 20, 2008. Among other things, counsel for the defendants asked Van de Graaf: (1) how the total-insured value for the Association would have been known to the defendants in March 2005; (2) the documentary basis for his conclusion the defendants should have purchased reinsurance of $450 million for the 2005 hurricane season; and (3) why he believed there would be sufficient capacity in the market to permit such a purchase.

The defendants argue that Van de Graaf came up with a "back-of-the-envelope calculation" that adequate reinsurance would have been between $350 million (in 2004) and $481 million on the day Katrina hit, but he eventually settled on $450 million as the number. They also attack Van de Graaf's admissions that reasonable reinsurance professionals could disagree with his opinion, that he knows of no standards by which to judge the MWUA's reinsurance purchase, and that a key reason why no such standards exist is that the MWUA is a unique entity.

According to the defendants, these admissions reveal Van de Graaf's opinions to be exactly what *Daubert v. Merrell Dow Pharms., Inc.*, 509 US. 579, 590 (1993), and its progeny condemn as "subjective belief or unsupported speculation" masquerading as "scientific knowledge." They then assert that Van de Graaf's subjective opinions are even more unreliable because they are based on no experience with entities

comparable to the MWUA, even though they acknowledge that Van de Graaf spent some 40 years working for reinsurance brokers.

## **ADMISSIBILITY OF EXPERT TESTIMONY**

Since the Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993), federal courts have heeded the admonition set forth therein that they should take seriously their role as "gatekeepers" of testimony offered by expert witnesses in federal courts. The initial reaction to *Daubert* was that it was a victory for the *Daubert* plaintiffs in that it vacated a Ninth Circuit opinion which upheld the exclusion of the plaintiff's experts in one round of the Bendectin birth defect cases. The Supreme Court in *Daubert* said the *Frye* general acceptance test for expert testimony had been superseded by Rule 702 of the Federal Rules of Evidence which went into effect in 1975. Rule 702 provided at the time:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

A primary requisite of the rule is that the evidence or testimony "assist the trier of fact to understand the evidence or determine a fact in issue." The commentators universally agree that the effect of *Daubert* was not the loosening of the allowance of expert testimony but in fact a tightening thereof. In fact when *Daubert* was vacated and remanded to the Ninth Circuit, the Ninth Circuit again upheld the district court's exclusion of the plaintiff's expert witnesses based on the new standard enunciated in *Daubert*. *Wm. Daubert, et al v. Merrell Dow Pharmaceuticals, Inc.*, 43 F. 3d 1311 (9th

Cir. 1995). Thereafter the United States Supreme Court denied certiorari. *Daubert, et al v. Merrell Dow Pharmaceuticals, Inc.*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

The cases and commentaries interpreting *Daubert* are legion at this point. The Supreme Court in *Daubert* enumerated several factors to be considered by the trial court in determining whether or not a particular expert witness's testimony was relevant and reliable to the point that it should be allowed in federal court. Those factors are not exclusive and were merely presented as a guideline. The federal courts were instructed that the *Daubert* standard is "a flexible one" to be applied according to the facts and circumstances of each individual case. 509 U.S. at 594.

After *Daubert*, there was much discussion as to whether or not it applied merely to cases involving scientific knowledge or whether it should be expanded to include all expert testimony regardless of its scientific basis. The Supreme Court answered that question in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999). The *Kumho* court held

> We conclude that *Daubert's* general holding--setting forth the trial judge's general "gatekeeping" obligation--applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.

119 S. Ct. at 1171. Ultimately "the objective of that [gatekeeping] requirement is to insure the reliability and relevancy of expert testimony." *Kumho*, 119 S. Ct. at 1176. In *Kumho* "the relevant issue was whether the expert could reliably determine the cause of [the] tire's separation." 119 S. Ct. at 1177.

This court has been instructed by *Kumho* interpreting *Daubert* that the opinions stated by Van de Graaf are not the object of the relevancy and reliability determination but instead the court is required to determine the reliability of his basis for arriving at those conclusions. 119 S.Ct. at 1177. The factors set forth in *Daubert* and recited in *Kumho* include whether the theory or technique can be and has been tested; whether or not it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation and whether the theory or technique enjoys general acceptance within a relevant scientific community.

This court recognizes that several of the factors listed above are not relevant to a determination of the issue before this court. Therein lies the flexibility of the gatekeeping responsibility as mandated by the Supreme Court. As the Fifth Circuit has noted, several prior opinions on admissibility of expert testimony placed undue emphasis on *qualifications* of a particular expert witness over the *reliability* of that expert's proposed testimony and such reflected a "pre-*Daubert*" sensibility. *See, Watkins v. Telsmith*, 121 F. 3d 984, 992 (5th Cir. 1997). In this age of "post-*Daubert*" sensibility, especially as enlightened by the United States Supreme Court's pronouncement in *Kumho*, the trial courts were instructed to carefully execute the responsibility placed upon the court as a "gatekeeper" of proposed expert testimony.

In response to *Daubert* and the many cases applying *Daubert*, including *Kumho*, Federal Rule of Evidence 702 was amended effective December 1, 2000, by adding three requirements for the admissibility of expert testimony. *See Hodges v. Mack*

*Trucks Inc.*, 474 F.3d 188 (5th Cir. 2006). As amended, Rule 702 now reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* factors remain relevant to the determination of the reliability of expert testimony under Rule 702, as amended. *See Guy v. Crown Equipment Corp.* 394 F.3d 320, 325 (5th Cir. 2004). In assessing the basis of an expert's proposed testimony, the Fifth Circuit has held that an "expert's testimony [can be] based mainly on his personal observations, professional experience, education and training." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002). Ultimately, however, the question of whether an expert's testimony is reliable is a fact-specific inquiry. *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004). The proponent of the expert testimony must prove reliability by a preponderance of the evidence. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). "It is then the district court's responsibility to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Dart v. Kitchens Bros. Mfg. Co.*, 253 Fed.Appx. 395, 398 (5th Cir. 2007)(*quoting Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167).

## **ANALYSIS**

The plaintiffs assert that Van de Graaf's opinion that the MWUA was under-reinsured is admissible under Rule 702.  Van de Graaf has opined that "the board of directors of MWUA did not purchase adequate reinsurance capacity for the 2005 storm season."  According to the plaintiffs, he based that opinion on a variety of factors, including catastrophe modeling, the Association's alleged history of purchasing limits at the 500-year level, and the fact that primary insurers were reducing their own coverage in the Mississippi Coast Area, pushing greater and greater risks into the pool. He concluded that "MWUA board members should have insisted upon reinsurance in 2005 equal to at least a 500 year return period."  He also opined that such "adequate reinsurance capacity for the 2005 storm season . . . was available."  The defendants have challenged this opinion on four grounds: (1) it is subjective; (2) it wrongly concludes that the defendants reinsured to the 500-year level; (3) it is based on insufficient data; and (4) it is based upon the faulty assumption that such reinsurance would have been available to purchase.

On the first issue, i.e., the opinion's subjectivity, the court concludes that such does not require exclusion of the opinion.  Indeed,  the Fifth Circuit has held that an "expert's testimony [can be] based mainly on his personal observations, professional experience, education and training."  *Pipitone v. Biomatrix, Inc.*, 288 F.3d at 247.  Thus, the court finds that Van de Graaf is imminently qualified to state his personal opinions about the reinsurance market having been involved in it heavily for more than forty years.  Therefore, the defendants' argument that Van de Graaf's opinion is subjective does not disqualify it from being presented to the jury.

As to Van de Graaf's opinion that the MWUA should have purchased coverage to a 500-year storm level, the plaintiffs argue that he has approached his analysis with a rigor that is consistent with his standing as a preeminent reinsurance expert. Specifically, they point out that he analyzed six factors in coming to his conclusion that the Association should have bought reinsurance equal to that of a 500-year storm: catastrophe modeling; the Association's history of buying coverage; the concentration of exposure in a small geographic area; the nature of that exposure in relation to windstorm risks; the properties covered by the Association given its status as an insurer of last resort; and the fact that total-insured values were increasing during the relevant period due to primary insurers reducing exposure.

The defendants contend that Van de Graaf's opinion is nonetheless excludable because they disagree with his conclusion regarding at least one of the six factors he considered in arriving at his opinion that the defendants should have bought more reinsurance. Among other things, Van de Graaf assessed how the Association's history of purchasing reinsurance between 1998 and 2003 bears on the level of reinsurance that was appropriate for the 2004 and 2005 hurricane seasons. The defendants do not contend that there is anything wrong methodologically with this question. But they instead argue that his opinion should nonetheless be excluded because (1) his conclusion that the Association reinsured to the 500-year level during this period is "indisputably wrong," and (2) he "cherry picked" the most favorable year for his analysis and "ignored the years in time closer to Hurricane Katrina."

Whether the MWUA actually insured to a 500-year storm level, or whether it even

should have, is undisputably a question of fact to be resolved by the jury. Van de Graaf's opinion on this issue will be subjected to rigorous cross-examination, as it should be. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [even] shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

Thirdly, the defendants assert that Van de Graaf's opinion that the Association did not buy enough reinsurance is not based upon sufficient data or facts. The defendants do not contest that Van de Graaf considered voluminous facts and data when formulating his opinion that they should have procured reinsurance sufficient to cover a 500-year storm. Rather, they argue that Van de Graaf's conclusion that they should have modeled the Association's total-insured value on exposure of at least $1.8 billion is based upon information that would not have been known to the defendants until after Hurricane Katrina.

The plaintiffs argue that the record reflects that the defendants were aware of the Association's rising total-insured value throughout 2004 and 2005. The Board last considered reinsurance for the 2005 hurricane season at the October 2004 board meeting. At that meeting, the Chairman presented a report stating that "[t]he current insurance in force is over $1.6 billion," which "represents a 23% increase over last year's 26% increase from the previous year." This also represented an increase of nearly $250 million in total-insured value since the defendants had last requested modeling. Thus, according to the plaintiffs, given this information, the defendants could have and should have projected that the Association's total-insured value would reach

at least 1.8 billion in 2005, given the trajectory of the recent increases. The plaintiffs contend that Van de Graaf considered this information along with the minutes from the Board meeting directly before Hurricane Katrina in which the Association's total-insured value was announced to be nearly $1.75 billion—33% higher than the total-insured value that was the basis for the 2004 modeling.

The defendants may not like the data relied upon by Van de Graaf in reaching his conclusions or his conclusions themselves, but that does not make his methodology wrong or subject his opinions to exclusion. Once again, the court is certain that Van de Graaf's opinions, and the data he relied upon in reaching them, will be subjected to rigorous cross-examination.

Fourth, the defendants attack Van de Graaf's opinion that there was sufficient market capacity to allow the purchase of reinsurance to a 500-year storm level in 2005 because Van de Graaf has opined that the reinsurance market had capacity to provide the $450 million in coverage needed to reinsure the Association's risks to that level. The defendants seek to exclude this opinion because it "cannot be tested." They argue that Van de Graaf, has no personal knowledge as to whether there was sufficient capacity in the reinsurance market in 2004-05, which was five years after his retirement.

The plaintiffs argue that rather than assessing whether this opinion can be tested, the court should examine whether Van de Graaf "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Van de Graaf opines that capacity is a function of price, and "[i]f the price is ripe enough, the capacity will be there." Remarkably, the

defendants' expert, Skip Cooper, uses the same reasoning. This attack is, once again, properly directed at the weight the testimony is afforded and not its admissibility.

The defendants also seek to exclude Van de Graaf's opinions on two collateral grounds. First, they contend that Van de Graaf's testimony regarding the requirement that the Association buy reinsurance be excluded because he lacks the requisite experience to opine on that subject. Second, they assert that Van de Graaf failed to review a critical document relating to notice purportedly received by the membership with respect to the defendants' reinsurance decisions for 2005. In both cases, the plaintiffs argue that the defendants are wrong in ways that ignore the basic facts of this case.

The defendants seek to exclude this testimony on the grounds that Van de Graaf has never been the ultimate decision-maker for a purchaser of reinsurance and has no experience procuring reinsurance for an entity like the MWUA. However, Van de Graaf testified,

> I served on the Board of a semi-involuntary pool. I was on the Nuclear Energy Liability Insurance Association . . . and certainly we all represented different companies, but we were all concerned about the level of reinsurance, particularly because nuclear energy had catastrophic potential.

In that role, Van de Graaf worked with a reinsurance broker to purchase limits of $560 million. The defendants have not shown a sufficient basis to exclude Van de Graaf's opinions on this issue.

Finally, the plaintiffs argue that the court should admit Van de Graaf's opinion regarding the lack of notice provided to the membership regarding the reinsurance

placed for the 2005 hurricane season.  The defendants contend that Van de Graaf failed to consider a key document that proves that the defendants informed the membership about their reinsurance purchases for 2005.  However, it appears that not only did Van de Graaf review the document—he discusses it on pages 12 and 13 of his Report—but three of the defendants have admitted through the testimony of their corporate representatives that it does not describe the coverage for the 2005 hurricane season. This argument provides no basis to exclude Van de Graaf's opinion.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion to Exclude Expert Opinions of Jacobus J. Van De Graaf **[#303]** filed on behalf of the defendants is denied.

SO ORDERED AND ADJUDGED this the 19th day or February, 2009

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE