# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

ASSOCIATION CASUALTY INSURANCE COMPANY;
BENCHMARK INSURANCE COMPANY; GEORGIA
CASUALTY & SURETY COMPANY; and NATIONAL
SECURITY FIRE and CASUALTY COMPANY      **PLAINTIFFS**

**VERSUS**           **CIVIL ACTION NO. 2:09cv24KS-JCS**

ALLSTATE INSURANCE COMPANY; FARM BUREAU
MUTUAL INSURANCE COMPANY; NATIONWIDE MUTUAL
FIRE INSURANCE COMPANY d/b/a NATIONWIDE INSURANCE
COMPANIES; STATE FARM FIRE AND CASUALTY COMPANY;
AND ST. PAUL TRAVELERS COMPANIES      **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the court on a Motion to Exclude Expert Opinions of Loren B. Kramer **[#301]** filed on behalf of the defendants Allstate Insurance Company, Nationwide Insurance Companies and State Farm Fire and Casualty Company(collectively, "Defendants"). All of the remaining defendants have filed endorsements adopting this motion. The court, having reviewed the motion, the response, the briefs of counsel, the pleadings and exhibits on file and being otherwise fully advised in the premises finds that the motion is not well taken and should be denied. The court specifically finds as follows:

## FACTUAL BACKGROUND

The court has detailed the origin, purpose, composition, and operation of the MWUA in prior opinions which will not be restated in full herein. Instead, the court will restate only enough factual background to support the present ruling.

The Mississippi Windstorm Underwriting Association is a mandatory unincorporated association formed by the Mississippi Legislature to provide windstorm insurance for the highest-risk properties in Mississippi and purchase reinsurance to protect the Association's members, who are responsible for its losses. The Association is a residual market organization whose structure causes the purchase of large amounts of reinsurance for the benefit of the members.

For almost two decades, the MWUA has made windstorm and hail insurance available to residents of the coastal counties of Mississippi who otherwise would not have been able to obtain such insurance in the voluntary insurance market. The legislation and the Plan define the "Coast Area" as the six southernmost counties of Hancock, Harrison, Jackson, Pearl River, Stone and George.

A Board of Directors both performs the general administrative duties of the Association and purchases reinsurance on its members' behalf by a majority vote of the Directors. Under the Plan of Operations that governs the Association's activities, the Board is required to act as each member's "agent . . . in ceding reinsurance on behalf of the Member as authorized by the Plan." (Plan of Operations, Art. XIII). The defendants were appointed Board Members by the Mississippi Insurance Commissioner and had representatives sitting on the Board during the reinsurance decisions at issue in this lawsuit.

When Hurricane Katrina hit on August 29, 2005, the MWUA had in place $175 million in reinsurance. Katrina, however, caused losses in excess of $700 million to the Association. The MWUA paid those Katrina claims, collected the full $175 million in reinsurance, and assessed the member insurance companies to pay the un-reinsured losses of approximately $525 million.

The plaintiffs, MWUA members who voluntarily wrote practically no windstorm and hail insurance in the Coast Area, were responsible for a portion of the MWUA's un-reinsured Katrina losses. They allege in this case that the Board of the MWUA purchased too little reinsurance and have sued to recover these un-reinsured losses and that the defendants failed to procure adequate reinsurance due to a conflict of interest having to do with their own responsibility for certain expense assessments coupled with a relative immunity to the consequences of a shortfall in reinsurance. The plaintiffs allege that these and other failures constitute negligence and breach of fiduciary duties on the part of the defendants.

The plaintiffs have proffered Loren B. Kramer as an expert on reinsurance accounting to render expert opinions regarding the internal accounting practices of the Mississippi Windstorm Underwriting Association. The plaintiffs assert that the defendants do not challenge Kramer's qualifications to provide expert testimony on accounting issues. Kramer is a CPA who specializes in consulting services for insurance companies, insurance regulators, liquidators, and others involved in insurance company litigation. Kramer's services generally relate to accounting and auditing matters, reinsurance issues and damages calculations. His background includes seventeen years of work with a major accounting firm as an insurance

company specialist.  He has provided testimony in various lawsuits or arbitrations relating to reinsurance or other insurance issues.  Mr. Kramer has reviewed the MWUA Plan of Operation and numerous MWUA financial records, board meeting minutes, depositions, and other documents relating to the MWUA operations and filings.  His report indicates that he bases his opinions upon the information contained in the MWUA records.

Although the defendants admit that Kramer has many years of experience auditing and consulting for insurance companies, they point out that he has never audited or consulted for a residual risk pool like the MWUA.  The defendants also argue that in connection with this engagement, Kramer did not review the financial statements of residual risk pools in other states or otherwise attempt to determine how comparable risk pools accounted for reinsurance premiums nor did he even know whether other states have plans similar to the MWUA.

Kramer's report discloses twelve opinions that he intends to offer at trial, the majority of which stem from his criticism of the manner in which the MWUA accounted for reinsurance premiums.  The defendants seek to exclude ten of these opinions (#s 1, 2, 3, 5, 6, 8, 9, 10, 11, and 12) from consideration by the jury.  Specifically, they seek to exclude Opinions 1, 2, 3, 8, 9, 10, 11 and 12 on the basis of relevance asserting that they do not fit the facts of the case.  They seek exclusion of Opinions 5 and 6 on the basis that these two opinions rely on the expert report of Jacobus J. Van de Graaf, whom the defendants have sought to exclude by separate motion.  The court has denied that motion by separate opinion and thus, the defendants' arguments for the exclusion of Kramer Opinions 5 and 6 are for naught and will not be further addressed

herein. Instead, the court will focus on the exclusion request as to the remaining eight opinions.

## ADMISSIBILITY OF EXPERT TESTIMONY

Since the Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993), federal courts have heeded the admonition set forth therein that they should take seriously their role as "gatekeepers" of testimony offered by expert witnesses in federal courts. The initial reaction to *Daubert* was that it was a victory for the *Daubert* plaintiffs in that it vacated a Ninth Circuit opinion which upheld the exclusion of the plaintiff's experts in one round of the Bendectin birth defect cases. The Supreme Court in *Daubert* said the *Frye* general acceptance test for expert testimony had been superseded by Rule 702 of the Federal Rules of Evidence which went into effect in 1975. Rule 702 provided at the time:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

A primary requisite of the rule is that the evidence or testimony "assist the trier of fact to understand the evidence or determine a fact in issue." The commentators universally agree that the effect of *Daubert* was not the loosening of the allowance of expert testimony but in fact a tightening thereof. In fact when *Daubert* was vacated and remanded to the Ninth Circuit, the Ninth Circuit again upheld the district court's exclusion of the plaintiff's expert witnesses based on the new standard enunciated in

*Daubert*. *Wm. Daubert, et al v. Merrell Dow Pharmaceuticals, Inc.*, 43 F. 3d 1311 (9th Cir. 1995). Thereafter the United States Supreme Court denied certiorari. *Daubert, et al v. Merrell Dow Pharmaceuticals, Inc.*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

The cases and commentaries interpreting *Daubert* are legion at this point. The Supreme Court in *Daubert* enumerated several factors to be considered by the trial court in determining whether or not a particular expert witness's testimony was relevant and reliable to the point that it should be allowed in federal court. Those factors are not exclusive and were merely presented as a guideline. The federal courts were instructed that the *Daubert* standard is "a flexible one" to be applied according to the facts and circumstances of each individual case. 509 U.S. at 594.

After *Daubert*, there was much discussion as to whether or not it applied merely to cases involving scientific knowledge or whether it should be expanded to include all expert testimony regardless of its scientific basis. The Supreme Court answered that question in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999). The *Kumho* court held

> We conclude that *Daubert's* general holding--setting forth the trial judge's general "gatekeeping" obligation--applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.

119 S. Ct. at 1171. Ultimately "the objective of that [gatekeeping] requirement is to insure the reliability and relevancy of expert testimony." *Kumho*, 119 S. Ct. at 1176. In *Kumho* "the relevant issue was whether the expert could reliably determine the cause of

[the] tire's separation." 119 S. Ct. at 1177.

This court has been instructed by *Kumho* interpreting *Daubert* that the opinions stated by Van de Graaf are not the object of the relevancy and reliability determination but instead the court is required to determine the reliability of his basis for arriving at those conclusions. 119 S.Ct. at 1177. The factors set forth in *Daubert* and recited in *Kumho* include whether the theory or technique can be and has been tested; whether or not it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation and whether the theory or technique enjoys general acceptance within a relevant scientific community.

This court recognizes that several of the factors listed above are not relevant to a determination of the issue before this court. Therein lies the flexibility of the gatekeeping responsibility as mandated by the Supreme Court. As the Fifth Circuit has noted, several prior opinions on admissibility of expert testimony placed undue emphasis on *qualifications* of a particular expert witness over the *reliability* of that expert's proposed testimony and such reflected a "pre-*Daubert*" sensibility. *See, Watkins v. Telsmith*, 121 F. 3d 984, 992 (5th Cir. 1997). In this age of "post-*Daubert*" sensibility, especially as enlightened by the United States Supreme Court's pronouncement in *Kumho*, the trial courts were instructed to carefully execute the responsibility placed upon the court as a "gatekeeper" of proposed expert testimony.

In response to *Daubert* and the many cases applying *Daubert*, including *Kumho*, Federal Rule of Evidence 702 was amended effective December 1, 2000, by adding

three requirements for the admissibility of expert testimony. *See Hodges v. Mack Trucks Inc.*, 474 F.3d 188 (5th Cir. 2006). As amended, Rule 702 now reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* factors remain relevant to the determination of the reliability of expert testimony under Rule 702, as amended. *See Guy v. Crown Equipment Corp.* 394 F.3d 320, 325 (5th Cir. 2004). In assessing the basis of an expert's proposed testimony, the Fifth Circuit has held that an "expert's testimony [can be] based mainly on his personal observations, professional experience, education and training." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002). Ultimately, however, the question of whether an expert's testimony is reliable is a fact-specific inquiry. *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004). The proponent of the expert testimony must prove reliability by a preponderance of the evidence. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). "It is then the district court's responsibility to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Dart v. Kitchens Bros. Mfg. Co.*, 253 Fed.Appx. 395, 398 (5th Cir. 2007)(*quoting Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167).

## ANALYSIS

The defendants first attack Kramer's opinions by asserting that his own testimony confirms that his opinions regarding the treatment of reinsurance premiums do not "fit" the facts. They argue that although Kramer believes that reinsurance premiums should have been treated as a First Tier Association Administrative Expense for purposes of member assessments, he repeatedly conceded that the MWUA did not in fact treat them that way. This makes a difference because First Tier expenses were passed through to all members to be paid in accordance with their proportionate part of the overall state writings, without the benefit of voluntary underwriting credits whereas Second Tier expenses were not.

Thus, if reinsurance premium costs were treated as a First Tier expense, the defendants would have been liable for the lion's share of such. However, even though the audited financial statements treated reinsurance costs as a First Tier expense, the "participation statements" which governed the collection of member assessments treated them as a Second Tier expense. This latter treatment would obviate the plaintiffs' argument that the defendants failed to purchase reinsurance out of a desire to reduce their exposure to such costs. Indeed, under the method of accounting purportedly used by the defendants to account for reinsurance costs, they had little or no exposure to pay for such.

However, the plaintiffs assert that this mischaracterizes their complaint. They contend that their claim of self interest arises, among other things, in the context of the failure of the defendants to purchase adequate reinsurance because the assessment for

such costs, if one were made, would have been a First Tier expense which would have subjected the defendants to exposure for payment of a substantial part of same. The defendants never made such an assessment because they determined to only purchase reinsurance out of funds on hand rather than to invoke an assessment to purchase additional reinsurance.

While the accounting arguments are rather complex in the context of how what was accounted for and why, the arguments that the defendants did not purchase additional reinsurance out of either negligence or out of a desire to avoid an assessment, seem to the meritorious at this point. Kramer's testimony on these issues would appear to the court to provide insight on these complex issues. However, if the presentation of evidence at trial comports with the defendants' assessment of the state of the record, the relevance of a number of Kramer's opinions may indeed prove to be useless. That being said, the court deems it necessary to deny the motion as to the relevancy argument of the defendants at the present time with the assurance that it will be revisited at trial.

The defendants attack Kramer's Opinions 8 through 12 additionally on the basis that Kramer's report provides calculations purporting to demonstrate "excess" reinsurance premiums paid by the plaintiffs in the past and that the plaintiffs' counsel stipulated at Kramer's deposition and again in their Response Brief that the plaintiffs make no claim for a refund of such premiums. The plaintiffs respond that among other things, these aspects of Kramer's report are relevant to how much MWUA members would have had to pay if the MWUA had assessed members to raise money to

purchase reasonable and appropriate reinsurance and to provide a broad factual background for the accounting practices employed by the MWUA. The plaintiffs affirm that they do not intend to rely on these opinions to prove damages, but state that it is simply inaccurate to suggest that they are therefore wholly irrelevant to any claim or unreliable.

The court finds that while these opinions may be of questionable use to the jury based upon the damage claims asserted by the plaintiffs, the correct way to deal with them is to deny the motion to strike and review the admissibility of them when offered at trial.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion to Exclude Expert Opinions of Loren B. Kramer **[#301]** filed on behalf of the defendants is denied.

SO ORDERED AND ADJUDGED this the 19th day or February, 2009.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE